## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **TOUYA J. JOHNSON,** | **CASE NO. 11-02071-NPO** |
| **DEBTOR.** | **CHAPTER 13** |
| **TOUYA J. JOHNSON** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 11-00131-NPO** |
| **MAGEE RENTALS, INC.** | **DEFENDANT** |

### MEMORANDUM OPINION AND ORDER ON COMPLAINT
### SEEKING DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY

There came on for trial on July 18, 2012 (the "Trial"), the Complaint Seeking Damages for Violation of the Automatic Stay (the "Complaint") (Adv. Dkt. 1)[1] filed by Touya J. Johnson (the "Debtor"), and the Defenses and Answer of Magee Rentals, Inc. (Adv. Dkt. 6) filed by Magee Rentals, Inc. ("Magee Rentals"), in the above-referenced adversary proceeding (the "Adversary"). The Pretrial Order (Adv. Dkt. 17) was approved by the Court on July 6, 2012.

At Trial, Edwin Woods, Jr. ("Woods"), with the law firm of Bond Botes & Woods, P.C. ("Bond Botes & Woods"), represented the Debtor, and Marc E. Brand represented Magee Rentals. By stipulation, the Debtor introduced into evidence five exhibits, Debtor Exhibits 1-5, and Magee Rentals introduced into evidence nine exhibits, Magee Exhibits 1-9.  During the Trial, Magee

---

[1] Unless stated otherwise, citations to the record are as follows: (1) citations to docket entries in the adversary proceeding, Adv. Proc. No. 11-00131-NPO, are cited as "(Adv. Dkt. ___)"; and (2) citations to docket entries in the main bankruptcy case, Case No. 11-02071-NPO, are cited as "(Dkt. ___)".

Rentals withdrew its objection to Debtor Exhibit 6, and the exhibit was admitted into evidence.[2]  In addition to her own testimony, the Debtor presented the testimony of six witnesses:  (1) Michael Bass ("Bass"), the Debtor's boyfriend; (3) Matthew A. Love ("Love"), an attorney formerly associated with Bond Botes & Woods; (3) Jerry Wayne Hilton ("Hilton"), the owner and president of Magee Rentals; (4) Cindy Breaux ("Breaux"), the store manager of Magee Rentals; (5) Alicia Floyd ("Floyd"), the assistant manager and account manager of Magee Rentals; and (6) Woods. Magee Rentals, in its case-in-chief, called three witnesses: (1) Hilton, (2) Breaux, and (3) Floyd.  At issue in the Adversary is whether Magee Rentals violated the automatic stay under 11 U.S.C. § 362(a),[3] and if so, whether the Debtor is entitled to damages under § 362(k).  The Court, having considered the pleadings, evidence, and arguments of counsel, finds that the Debtor has successfully demonstrated that Magee Rentals willfully violated the automatic stay and is entitled to damages in the amount of $3,300.00 for the reasons set forth below.[4]  This Opinion memorializes and supplements the Court's ruling from the bench rendered at the close of the Trial.

## I. Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).  Notice of the

---

[2] Hereinafter, exhibits introduced into evidence at Trial by the Debtor are cited as "(Debtor Ex. ____)".  Exhibits introduced into evidence at Trial by Magee Rentals are cited as "(Magee Ex. ____)".

[3] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

[4] Pursuant to Federal Rule of Civil Procedure 52, as made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

Trial was proper under the circumstances.

## II. Facts

The following facts are derived from the stipulations included in the Pretrial Order, as well as from the evidence presented at the Trial.

1.      The Debtor is a family protection worker with the Mississippi Department of Human Services, Division of Family and Children Services, in Prentiss, Mississippi.[5]  (Dkt. 4 at 15).  At Trial, the Debtor testified that her annual gross salary is $27,614.15.[6]

2.      Magee Rentals is a Mississippi corporation operating as a rent-to-own store in Magee, Mississippi.  (Adv. Dkt. 17 at 3).

3.      Magee Rentals has been owned and operated by Hilton since it first opened in 1989.[7]

4.      On November 30, 2010, the Debtor entered into a Rental Purchase Agreement, Agreement # 18757 (the "Rental Agreement"), with Magee Rentals for the rental of a television cabinet[8] (the "TV Cabinet"). (Magee Ex. 1).

5.      Under the Rental Agreement, the Debtor agreed to pay $135.80 per month (or $33.95 per week) to Magee Rentals for use of the TV Cabinet.  (Magee Ex. 1).  The term of the lease was 18 months (or 78 weeks) at the end of which time the Debtor could own the TV Cabinet.

––––––––––––––––––––

[5] Test. of Debtor at 9:35:53-9:36:04.  The Trial was not transcribed.  References to testimony are cited by the timestamp of the audio recording.

[6] Id. at 9:47:46-9:47:54.

[7] See Test. of Hilton at 1:58:41-1:58:59.

[8] The Debtor also rented a refrigerator from Magee Rentals but returned it prior to filing her bankruptcy petition.  (Magee Ex. 2, ¶ 6).

A.      **Magee Rentals' Debt Collection Policy**

6.      There was some conflicting evidence at Trial regarding Magee Rentals' debt collection policy as to customers in bankruptcy.  In the Response of Magee Rentals, Inc. to Plaintiff's First Set of Interrogatories (the "Response"), Magee Rentals set forth its policy as follows: "[i]f a customer advises that [she] has filed bankruptcy then Magee [Rentals] waits for notification from the Court and when proper notification is received it ceases all collection activity."  (Debtor Ex. 2, ¶ 5).  Also in the Response, Magee Rentals stated that when it receives proper notice from the Court, "the account is removed from Magee [Rentals'] computer system."  (Debtor Ex. 2, ¶ 5).

7.      Consistent with the Response, Magee Rentals stipulated in the Pretrial Order that it was "the official policy of Magee Rentals . . . [to] continue all collection efforts against a non-paying customer and cease such collection efforts only after an official notice was received from a bankruptcy court advising that such non-paying customer had filed a bankruptcy case."  (Adv. Dkt. 17, ¶ 11(*l*)).

8.      Floyd testified at Trial that the store policy was that "we don't go on just a phone call or hearsay, we stop [collection efforts] after we get the bankruptcy paperwork."[9]

9.      The testimony of Hilton, the owner and president of Magee Rentals, as to its store policy differed not only from the policy outlined in the Response and in the Pretrial Order, but also from Floyd's testimony.  Hilton testified that once the store learned that a customer had filed for bankruptcy, whether by written notification from the bankruptcy court or oral notice from the customer, the store policy was to stop all communications with the customer and remove that

---

[9] Test. of Floyd at 12:28:35-12:28:45.

customer's account from the store's computer system.[10]

10.     Hilton testified that as the owner of Magee Rentals, he was ultimately responsible for deciding how the store handled debt collections against customers in bankruptcy.[11] Hilton acknowledged that he was generally familiar with the Bankruptcy Code[12] and with the automatic stay provision.[13]

## B.     Bankruptcy Case

11.     On June 10, 2011, the Debtor filed a voluntary petition (the "Petition") for relief under chapter 13 of the Bankruptcy Code.  (Dkt. 1).

12.     According to Magee Rentals, the Debtor's payments were "sporadic."  (Debtor Ex. 2, ¶ 6).  Magee Rentals claimed that the Debtor made her last and final payment on the Rental Agreement in the amount of $100.00 on May 14, 2011, and that thereafter the Debtor became in default on May 19, 2011.  Id.  In contrast, the Debtor testified that she remained current on her payments to Magee Rentals prior to filing her Petition on June 10, 2011.[14]

13.     Along with the Petition, the Debtor filed her verified schedules.  (Dkt. 4).  In Schedule D-Creditors Holding Secured Claims, the Debtor listed Magee Rentals as a secured

---

[10] Test. of Hilton at 11:33:30-11:33:56; 11:40:40-11:40:58.

[11] Id. at 11:29:50-11:31:26.

[12] "Bankruptcy Code" or "Code" refers to the United States Bankruptcy Code located at Title 11 of the United States Code.  All Code sections hereinafter will refer to the Bankruptcy Code unless specifically noted otherwise.

[13] Test. of Hilton at 11:47:20-11:47:31.

[14] Test. of Debtor at 9:58:40-9:58:46.

creditor[15] with a claim in the amount of $1,700.00.  Id. at 6. The Debtor identified the collateral

securing Magee Rentals' claim as an "ENTERTAINMENT CENTER" valued at $1,000.00.  Id.

14.     The Debtor filed her chapter 13 plan (the "Plan") with the Petition.  (Dkt. 2).  In the

Plan, the Debtor again listed Magee Rentals as a secured creditor with a claim in the amount of

$1,700.00.    The Debtor proposed to pay Magee Rentals the value of its collateral, the

"ENTERTAINMENT CENTER" or TV Cabinet, $1,000.00, plus 7% interest through the Plan.  Id.

 The total amount the Debtor proposed to pay Magee Rentals through the Plan was $1,188.00.  Id.

15.     In the creditor mailing matrix, the Debtor listed Magee Rentals' address as "105 1st

SE, Magee, Mississippi 39111."  (Dkt. 3).

16.     On June 15, 2011, a Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors,

& Deadlines (the "Notice of Bankruptcy Case") (Dkt. 8) was mailed to the Debtor's creditors,

including Magee Rentals.  (Dkt. 10).

17.     On June 23, 2011, the Notice of Bankruptcy Case was returned to the Clerk of the

Bankruptcy Court (the "Clerk") by the U.S. Postal Service because of an insufficient address.

(Magee Ex. 2; Dkt. 13).  The Clerk sent a copy of the envelope marked "return to sender" to Woods.

Id.

18.     On July 6, 2011, the Debtor filed her Objection to Secured Claim(s) and Other Relief

(the "Objection") (Magee Ex. 3; Dkt. 17) in which the Debtor requested that this Court set the value

of Magee Rentals' claim.  The Objection proposed to treat Magee Rentals' claim of $1,700.00, as

secured up to the value of the TV Cabinet of $1,000.00, "plus interest of 7%, with the balance to be

---

[15] The Court does not address whether the Rental Agreement qualifies under the Code for
treatment as an executory contract pursuant to § 365.  See In re Johnston, No. 10-04143-NPO
(Bankr. S.D. Miss. Feb. 18, 2011).

treated as an unsecured debt to be paid through [the Plan]."[16]  Id.

19     Thereafter, on August 17, 2011, an Order Confirming the Debtor's Plan, Awarding a Fee to the Debtor's Attorney and Related Orders (Dkt. 30) was entered.

### 1.     Post-Petition Conduct of Magee Rentals

20.    The post-Petition conduct of Magee Rentals that the Debtor challenges in the Adversary occurred almost entirely during the month of September, 2011.

21.    The Debtor testified that shortly after filing the Petition, she spoke with Breaux, the store manager at Magee Rentals.  The Debtor testified that during their conversation she informed Breaux that she had filed  for bankruptcy and provided Breaux her bankruptcy attorney's name and telephone number.[17]

22.    Breaux contradicted the Debtor's testimony.  Breaux testified that she did not speak with the Debtor during the months of June, July, August or September, 2011.[18]

23.    Floyd testified that she called the Debtor about the status of her account sometime in July, 2011, and informed the Debtor at that time that Magee Rentals had not received any paperwork from the bankruptcy court, or from her attorney, notifying the store that she had filed a bankruptcy petition.[19]

24.    Floyd recalled that during their conversation the Debtor told her that she had indeed

---

[16] In the Pretrial Order, Magee Rentals stipulated that Debtor's "counsel mailed a copy of the [Objection] to Magee Rentals via U.S. Mail, postage prepaid."  (Adv. Dkt. 17, ¶ 11(d)).

[17] Test. of Debtor at 9:19:44-9:20:21.

[18] Test. of Breaux at 12:17:40-12:17:51.

[19] Test. of Floyd at 1:52:02-1:52:44.

filed for bankruptcy.[20]

25.    In the Response, Magee Rentals admitted that sometime prior to September 1, 2011, the store learned from the Debtor that she had filed a bankruptcy petition. This date is consistent with the testimony of the Debtor and Floyd. (Debtor Ex. 2, ¶ 6). Magee Rentals also stipulated to this date in the Pretrial Order. (Adv. Dkt. 17, ¶ 11(e)).

26.    There was no evidence at Trial that anyone at Magee Rentals attempted to contact the Clerk directly for confirmation of the bankruptcy filing by the Debtor during this time period.

### a.    Door Hangers

27.    On September 1, 2011, sometime between 11:30 a.m. and 12:00 p.m., two individuals from Magee Rentals drove to the Debtor's residence and hung a rectangular paper hanger, known as a door hanger, on her front door.[21]

28.    At Trial, Bass, who is the Debtor's boyfriend, testified that he was at home with the Debtor's son when the two men drove up the driveway.[22]

29.    The door hanger appears to be a printed form used by Magee Rentals. (Magee Ex. 5). There are blanks on the door hanger for the date and the customer's name, among other information. Underneath the customer's name appears the sentence, "I was by at _____ [ ] a.m./[ ] p.m. to:". Id. Underneath this sentence, there is a list of five reasons that complete the sentence, including "Deliver Set, Service Set, Collect Rent, Discuss Your Account, and Pick-up Set." Id. On the door hanger, Magee Rentals checked the box next to "Pick-up Set" as the reason for its visit to

---

[20] Id.

[21] Test. of Bass at 10:58:45-11:02:58.

[22] Id. at 10:59:58-11:00:03.

the Debtor's residence.  Id.  The door hanger also identified the amount due Magee Rentals on the TV Cabinet as $519.44.  Id.

30.     Hilton testified that the intent of Magee Rentals in leaving the door hangers was not to collect the debt owed on the TV Cabinet by the Debtor, but, rather, to request that the Debtor call Magee Rentals about her account.[23]

31.     Bass testified that on September 1, 2011, after the representatives from Magee Rentals left the residence, he called the Debtor at work to tell her what had occurred.[24]

32.     After talking to Bass on the telephone, the Debtor left work and returned home for the day "to make sure I was able to keep my merchandise and to see if [Magee Rentals was] actually going to come by again."[25]

33.     On two other occasions, on September 12, 2011, and September 19, 2011, Magee Rentals visited the residence and each time placed a new door hanger on the front door of the Debtor's residence.  The three door hangers are similar to one another.  The main differences are the amounts due, which increased from $519.44, on September 1, 2011, to $592.02 on September 12, 2011, and then to $664.74, on September 19, 2011.

34.     Bass testified that on September 12, 2011, and September 19, 2011, he again watched the representatives from Magee Rentals leave the door hanger on the front door of the residence and again called the Debtor at work to tell her what had occurred.[26]  On each occasion, the Debtor reacted

---

[23] Test. of Hilton at 11:48:00-11:48:48.

[24] Test. of Bass at 11:06:06-11:06:34.

[25] Test. of Debtor at 9:36:10-9:36:25.

[26] Test. of Bass at 11:06:06-11:06:34; Test. of Debtor at 9:37:55-9:38:29.

as she had on September 1, 2011, that is, she left work and returned home for the day.[27]

### b. Debtor's Communications with Bond Botes & Woods

35.     The Debtor testified that during the month of September, 2011, she informed her attorney, Love at Bond Botes & Woods, on one, or maybe two, occasions, about Magee Rentals' post-Petition conduct. [28]

36.     According to the Debtor, during one of their telephone conversations, Love suggested that she keep a log of telephone calls from Magee Rentals and that she send him a facsimile of the door hanger.[29]

37.     Love testified at Trial that he recalled speaking with the Debtor on "at least two separate . . . [occasions] about the continued collection efforts by Magee Rentals against her" sometime in September, 2011.[30]

38.     Love testified that sometime prior to September 19, 2011, he met with the Debtor at the Bond Botes & Woods office in Byram, Mississippi.  According to Love, the Debtor brought some of the door hangers placed by Magee Rentals at her residence, as well as a call-log documenting the names and telephone numbers of the individuals from Magee Rentals who had contacted her.[31]

39.     Love testified that he did not contact Magee Rentals immediately after meeting with the Debtor as "it was an ongoing process we were working on . . . to determine the extent of the stay

---

[27] Test. of Debtor at 9:36:10-9:36:25; 9:37:55-9:38:29.

[28] Id. at 9:28:03-9:28:42.

[29] Id. at 9:28:28-9:28:54.

[30] Test. of Love at 10:40:50-10:42:00.

[31] Id. at 10:45:49-10:46:44.

violation and gathering the documents so that I'd be prepared when I did call Magee Rentals."[32]

40.    After receiving the third door hanger on September 19, 2011, the Debtor again spoke with Love.  During their conversation, the Debtor agreed to send him the remaining door hangers, as well as a call-log.[33]  (Debtor Ex. 4).

41.    The next day, on September 20, 2011, Love contacted Magee Rentals and spoke with Breaux.  Love recalled that during their conversation, Breaux admitted that Magee Rentals was aware of the Debtor's bankruptcy case.  However, Breaux informed Love that Magee Rentals would continue to attempt to collect rent from the Debtor until the store received written notice from the bankruptcy court verifying the bankruptcy filing.[34]  (Adv. Dkt. 17, ¶ 7(a)).[35]

42.    Immediately after his conversation with Breaux, Love sent Breaux at Magee Rentals by facsimile a copy of the Notice of Bankruptcy Case Filing and a form for filing a proof of claim, in accordance with Breaux's request.[36]  (Debtor Ex. 4; Magee Ex. 4).

43.    Love also prepared a "Memorandum to the File of: Touya Johnson" (the "Memo"), which is dated September 20, 2011.  (Debtor Ex. 4).  In the Memo, Love recounted Magee Rentals' position, as stated by Breaux, that it would not stop attempting to collect from the Debtor until the store received written notice of the bankruptcy from the bankruptcy court.  Id.  Love believed that

---

[32] Id. at 10:47:18-10:47:59.

[33] Test. of Debtor at 9:28:04-9:28:58.

[34] Test. of Love at 10:34:45-10:37:28.

[35] Magee Rentals stipulated in the Pretrial Order that the conversation occurred as testified to by Love at Trial.  (Adv. Dkt. 17, ¶ 11(j)).

[36] Test. of Love at 10:37:18-10:37:34.

Magee Rentals had previously received formalized, written notice of the filing of the Petition.  Id.
However, as previously mentioned, the Notice of Bankruptcy Case was returned to the Clerk for
"insufficient address."  (Dkt. 13).

44.     The Debtor testified that after the third door hanger was hung on her front door, and
after Love sent by facsimile the Notice of Bankruptcy Case and the proof of claim form, Magee
Rentals did not attempt to contact her again.[37]

45.     On September 22, 2011, Magee Rentals filed a proof of claim ("Proof of Claim") (Cl.
No. 9-1) in the Debtor's bankruptcy case.  The Proof of Claim provided that Magee Rentals held a
claim, secured by the TV Cabinet, in the amount of $1,249.12.

46.     The Debtor's account was removed from Magee Rentals' computer system on
September 26, 2011, "for reason of BANKRUPTSY [sic]." (Debtor Ex. 3 at 6).

## C.     Adversary

47.     On October 24, 2011, the Debtor commenced this Adversary by filing the Complaint.
(Adv. Dkt. 1).

48.     In the Complaint, the Debtor alleged that the conduct of Magee Rentals post-Petition
willfully violated the automatic stay, and as a result, she is entitled to actual damages, including
attorney's fees and post-judgment interest.  (Adv Dkt. 1 at 3-4).

### 1.     Emotional Distress Damages

49.     In the Pretrial Order, the Debtor requested "[n]ot less than $2,000.00" in emotional
distress damages from Magee Rentals.  (Adv. Dkt. 17, ¶ 14).

50.     As a result of the actions taken by Magee Rentals post-Petition, the Debtor at Trial

---

[37] Test. of Debtor at 9:29:00-9:29:17.

testified that she experienced sleep loss[38] and anxiety.

51.     Bass testified that the actions of Magee Rentals resulted in the Debtor "crying and worrying all the time."[39]

52.     Additionally, Bass testified that Magee Rentals' conduct caused several arguments between the Debtor and himself.  According to Bass, he and the Debtor never argued prior to the appearance of the first door hanger, and curiously, have never argued since the collection efforts ceased.[40]

### 2.     Lost Wages and Travel Expenses

53.     The Debtor requested $28.03 in lost wages.  (Adv. Dkt. 17, ¶ 15).

54.     As previously mentioned, after each of the door hangers was placed at the Debtor's residence by Magee Rentals, the Debtor left work in the middle of the day to return home "to make sure I was able to keep my merchandise and to see if [Magee Rentals was] actually going to come by again."  As a result of these incidents, the Debtor testified that she lost approximately 12 hours of personal leave.[41]

55.     In addition, the Debtor asked this Court to award her travel expenses for her trips to consult with Woods at the Bond Botes & Woods' office in Vicksburg, Mississippi, and her trip to the U.S. Courthouse (the "Jackson Courthouse") in Jackson, Mississippi, for the Trial.[42]

---

[38] Id. at 9:43:13-9:44:00.

[39] Test. of Bass at 11:08:57-11:09:47.

[40] Id. at 11:25:29-11:25:59.

[41] Test. of Debtor at 9:46:54-9:47:54.

[42] Id. at 12:35:18-12:36:23.

56.     According to the Debtor, the Bond Botes & Woods' office in Vicksburg, Mississippi, is approximately 120 miles from her home, and the Jackson Courthouse is 52 miles away.  The Debtor requested mileage at the federal rate of $0.55 a mile.[43]

**3.     Attorney's Fees**

57.     In the Pretrial Order, the Debtor asked for $9,750.00 in attorney's fees "through the date of filing of the Pretrial Order."  (Adv. Dkt. 17, ¶ 15).

58.      At Trial, the Debtor testified that she had incurred $13,215.00 in attorney's fees in the Adversary.[44]

59.     Additionally, the Debtor entered into evidence at Trial an itemization of the professional services rendered (the "Professional Services Itemization") by Woods in the Adversary. (Debtor Ex. 5).

60.     The Professional Services Itemization showed that Woods expended a total of 44.05 hours at $300.00 an hour on the Adversary from September 26, 2011, until July 7, 2012, for a total of $13,215.00 in attorney's fees.  (Debtor Ex. 5).   Woods believed his fees were fair and reasonable,[45] in light of his experience and the novel question of law presented by the Adversary.

**4.     Punitive Damages**

61.     Finally, the Debtor requested that this Court award her punitive damages[46] in an amount "not less than $15,000.00."  (Adv. Dkt. 17, ¶ 16).

---

[43] Id.

[44] Id. at 9:50:40-9:54:10.

[45] Test of Woods at 2:15:25-2:16:33.

[46] Test. of Debtor at 9:52:26-9:52:50.

### III. Discussion

**A.      Willful Violation of the Automatic Stay**

"When a bankruptcy petition is filed, an automatic stay operates as a self-executing injunction" that prevents creditors from pursuing collections efforts against the debtor or the property of the debtor's estate for pre-petition debts.  Campbell v. Countrywide Home Loans, Inc., 545 F.3d 348, 354-55 (5th Cir. 2008).  The purpose behind the automatic stay in § 362(a) is to allow a debtor a "breathing spell" and a chance for a fresh start.  Templeton Mortg. Corp. v. Chesnut (In re Chesnut), 422 F.3d 298, 301 (5th Cir. 2005) (quotation omitted).  Should the automatic stay be violated, Congress has provided a debtor with a private right of action for any "willful violation." Campbell, 545 F.3d at 355.  Section 362(k) provides, in pertinent part: "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k).

Specific intent to violate the automatic stay is not required to prove the willfulness of a creditor's violation.  Campbell, 545 F.3d at 355.  Instead, the Fifth Circuit has established a three-part test for establishing an actionable violation of the stay under § 362(k):   (1) the creditor must have known of the existence of the stay, (2) the creditor's acts must have been intentional, and (3) the creditor's acts must have violated the stay.  Young v. Repine (In re Repine), 536 F.3d 512, 519 (5th Cir. 2008).  Here, the Debtor alleges that Magee Rentals knew she had filed a bankruptcy case and willfully violated the stay by intentionally engaging in the following acts: (1) calling her in an attempt to collect the debt and (2) driving to her home and placing door hangers on her front door.

Magee Rentals disputes the first element, knowledge of the existence of the stay.  Knowledge

of a pending bankruptcy is considered the same as knowledge of the existence of the stay.  In re Lile, 103 B.R. 830, 836-37 (Bankr. S.D. Tex. 1989).  Magee Rentals contends, however, that oral notice by the Debtor of her pending bankruptcy case, because it lacked independent verification, was insufficient to establish a stay violation.

There is a split of authority among courts as to whether oral notice of a pending bankruptcy case is sufficient.  Id. at 836-37.  Some courts have held that written confirmation of the filing of the bankruptcy petition is required.  *See, e.g.* Collier v. Hill (In re Collier), 410 B.R. 464, 472 (Bankr. E.D. Tex. 2009).  An often-cited treatise on bankruptcy law, and other courts, have held that oral notice is enough. 3 COLLIER ON BANKRUPTCY ¶ 362.02 (16th ed. 2012); *see also* Lile, 103 B.R. at 836.  At least one of those courts have reasoned that once a party receives notice of the filing of the petition, by any means, "[i]t is the responsibility of [the] part[y] stayed to ascertain whether a bankruptcy case has truly been commenced." *See, e.g.,* In re Freemyer Indus. Pressure, Inc., 281 B.R. 262, 267 (Bankr. N.D. Tex. 2002) (citations omitted).

This Court finds persuasive those decisions that have held that oral notice of the filing of a bankruptcy petition is sufficient to satisfy the "knowledge" element of § 362(k).  In this Court's view, requiring written notice of a bankruptcy case from the Clerk would run counter to Congress' intent in providing debtors with the protections of the automatic stay.  In addition to providing debtors with a "breathing spell . . . the purpose of the bankruptcy stay under . . . § 362 [is] further[ing] equity in distribution among . . . creditors by forestalling a race to the courthouse." Chesnut, 422 F.3d at 301 (quotation omitted).  Requiring written notice of the filing of a bankruptcy petition to establish "knowledge" for purposes of § 362(k) would encourage a "race to the courthouse," which is antithetical to the twofold purpose of the automatic stay.  Creditors could

continue trying to collect debts from debtors, even after the filing of a bankruptcy petition, so long as they had not yet received formalized notice. Even worse, some creditors could attempt to evade written notice altogether in order to continue their collection efforts against the debtors. In addition, requiring written notice might lead to protracted litigation. The Court can foresee litigation over what kind of written notice is required or whether the written notice must come from the Clerk.

At Trial, Floyd testified that she spoke with the Debtor sometime in July, 2011. During their conversation, the Debtor told Floyd that she had filed for bankruptcy. Magee Rentals admitted in the Response, and stipulated in the Pretrial Order, that the Debtor had informed the store that she had filed for bankruptcy before Magee Rentals hung the first door hanger. If Magee Rentals doubted the veracity of the Debtor's representation, it was incumbent upon Magee Rentals to contact the Clerk or to consult the appropriate website[47] to ascertain whether a petition had actually been filed. Neither Hilton, Breaux, nor Floyd contacted the Clerk to assuage their doubts about whether the Debtor had actually filed for bankruptcy. (Adv. Dkt. 17, ¶ 11(n)). Instead, they chose to ignore the Debtor's oral notice, and they continued to attempt to collect the rent.

Although Magee Rentals argued at Trial that the three door hangers were intended as "call me back card[s]," the Court finds this argument disingenuous. The Debtor was led to believe that the purpose of Magee Rentals' visit was to repossess the TV Cabinet. Notably, Magee Rentals arrived in a van large enough to move the furniture. If Magee Rentals had placed the door hangers as a "call me back card," as was suggested by Hilton, then Magee Rentals could have checked the box next to "Discuss Your Account," another pre-selected option for Magee Rentals' visit listed on

---

[47] Magee Rentals could have consulted the Public Access to Court Electronic Records ("PACER"), an internet service that allows users to obtain case and docket information from bankruptcy courts, as well as from other federal courts.

the door hangers. In addition, none of the three door hangers provided any special instructions to the Debtor informing her that the purpose of Magee Rentals' visit was nothing more than a request for a "call back." Finally, each of the three door hangers stated the amount due on the TV Cabinet to Magee Rentals, which is consistent with an effort to collect the debt.

This Court finds that each of these three incidents involving the door hangers were attempts by Magee Rentals to collect a debt, and, as a result, violated the automatic stay. Moreover, this Court finds that because Magee Rentals received notice of the filing of the Petition sometime in July, 2011, and the door hangers were placed at the Debtor's home in September, 2011, the Debtor has successfully demonstrated that Magee Rentals willfully violated the automatic stay, entitling the Debtor to damages.

**B.      Damages for Violation of the Automatic Stay**

A debtor who can successfully prove all three elements of a willful violation of the automatic stay may recover actual damages, including attorney's fees, and, if appropriate, punitive damages. *See* 11 U.S.C. § 362(k). Damages under § 362(k) "must be proven with reasonable certainty and may not be speculative or based on conjecture." Clayton v. Old Kent Mortg. Co. (In re Clayton), No. 09-03024, 2010 WL 4482810, *2 (Bankr. S.D. Tex. Oct. 29, 2010) (quotation omitted). In addition, courts have developed a special rule requiring that a moving party mitigate damages in actions brought under § 362(k). Tracy v. Bank of America (In re Tracy), No. 08-5125-C, 2010 WL 5462490, *1 (Bankr. W.D. Tex. Dec. 29, 2010) (citation omitted). The Court will consider the amount of all of the Debtor's damages and will address the mitigation issue separately.

**1.      Debtor's Actual Damages**

At Trial, the Debtor claimed she is entitled to actual damages for (1) lost wages, (2) travel

expenses, (3) emotional distress, and (4) attorney's fees.  The Court will address each category of damages in turn.

### a.  Lost Wages

The Debtor requested $28.03 in the Pretrial Order for lost wages.  At Trial, the Debtor testified that each time Magee Rentals came to her home and left a door hanger, on September 1, 12, and 19, 2011, she received a telephone call while at work from Bass informing her of what had occurred.  Thereafter, as a result of learning what Magee Rentals had done, the Debtor left work and returned home for the day "to make sure I was able to keep my merchandise and to see if [Magee Rentals was] actually going to come by again."   The Debtor testified that as a result of these incidents, she lost approximately 12 hours of personal leave.  The Debtor further testified that her annual gross salary is $27,614.15, but she failed to provide the Court with the necessary means by which to quantify her lost wages.  Although the amount requested by the Debtor appears to be lower than an amount that would reasonably compensate the Debtor for 12 hours of lost work, the Court, being constrained by the Pretrial Order, finds that she incurred lost wages of $28.03.

### b.  Travel Expenses

In addition, the Debtor asked this Court to award her travel expenses that she incurred during the litigation of the Adversary.  At Trial, the Debtor testified that she traveled 52 miles in order to attend the Trial at the Jackson Courthouse.  The Debtor also testified that she traveled 120 miles to meet with her attorney, Woods, at his office in Vicksburg, Mississippi.  The Debtor requested that she be compensated for her travel expenses at the federal rate of $0.55 per mile.[48]  This Court finds

---

[48] The business standard mileage rate is currently $0.555 per mile.  IRS Notice 2012-01. However, as the Debtor only requested to be reimbursed at a rate of $0.55 per mile for her travel to and from this Court for the Trial, this Court will award the Debtor the rate requested.

that the Debtor is entitled to travel expenses of $189.20, which consists of $57.20, for her trip to the

Jackson Courthouse and $132.00 for her trip to Woods' office in Vicksburg, Mississippi.

### c.    Emotional Distress

In the Pretrial Order, the Debtor requested "[n]ot less than $2,000.00" in emotional distress

damages.  The Fifth Circuit has not yet decided the standard of proof necessary for a debtor to

recover damages for an emotional distress claim  under § 362(k).  Repine, 536 F.3d at 521.  The

Fifth Circuit has cautioned, however, that a debtor must provide, at a minimum, "specific

information" regarding the damages caused by the emotional injury.  Id. at 521-22.  "[H]urt feelings,

anger and frustration are part of life, and are not the type of emotional harm that could support an

award of damages."  Collier v. Hill (In re Collier), 410 B.R. 464, 477 (Bankr. S.D. Tex. 2009).  A

debtor is entitled to damages only if she can show a "specific discernable injury to [her] emotional

state, proven with evidence regarding the nature and extent of the harm."  Id.  Corroborating

evidence of emotional distress from a spouse or close friend is not required    "but only if the

testimony [of a debtor] is particularized and extensive enough to meet the specificity requirement."

Id.  In addition, there must be a reasonable relationship between the willful violation and the

emotional injury.  Clayton, 2010 WL 4482810, at *3.

At Trial, the Debtor testified that because of Magee Rentals' conduct, she had problems

sleeping, suffered anxiety, and was unable to concentrate at work.  Bass corroborated the Debtor's

testimony regarding the Debtor's anxiety.  He testified that Magee Rentals' collection efforts caused

the Debtor to "cr[y] and worr[y] all the time."  Bass also testified that Magee Rentals' conduct

caused discord in their relationship.[49]   The Court finds that the testimony of the Debtor and Bass establishes that the Debtor sustained an emotional injury because of the stay violation.   Moreover, although the Court recognizes that hurt feelings do not generally necessitate an award of emotional injury damages, the Court finds that the Debtor's emotional distress went beyond hurt feelings because it interfered with her ability to perform her job.   This finding is supported by the fact that when Bass called her at work, she returned home for the rest of the day.

Although the Debtor has shown she is entitled to emotional distress damages, a few nights of interrupted sleep and a few weeks of anxiety from September 1, 2011, to September 19, 2011, do not merit damages of $2,000.00, the amount sought by the Debtor.   Considering all the circumstances, and the amount of awards granted in similar litigation, this Court finds that the Debtor has shown emotional distress damages of $500.00. *Cf.* Fauser v. Property Owners Ass'n of Canyon Village (In re Fauser), No. 11-03298, 2011 WL 6217009, *2 (Bankr. S.D. Tex. Dec. 14, 2011) (finding that the Debtor was entitled to $500.00 in actual damages as a result of 2-3 nights of sleep loss and headaches caused by a willful violation of the automatic stay).

### d.   Attorney's Fees

A debtor may recover reasonable attorney's fees and expenses incurred in prosecuting a § 362(k) action.   Repine, 536 F.3d at 522.   The Debtor seeks recovery of attorney's fees and costs billed by Woods in the amount of $13,215.00[50] from September 26, 2011, to July 17, 2012.  (Debtor Ex. 5).  The Debtor bears the burden of proving the reasonableness of these fees.

---

[49] Less credible was Bass' testimony that their relationship became perfectly harmonious after Magee Rentals ceased its collection efforts.

[50] This amount does not include any attorney's fees billed by Love.  (Debtor Ex. 5).

Page 21 of  26

In order to determine whether the fees set forth in the Professional Services Itemization are reasonable, this Court employs the "lodestar" method, which requires the Court to multiply the prevailing hourly rate in the community by the number of hours that an attorney would reasonably expend prosecuting the Adversary.   Walker & Peterson, P.C. v. Cahill (In re Cahill), 428 F.3d 536, 540 (5th Cir. 2005).  After calculating the "lodestar" fee, the Court considers whether to adjust that fee upwards or downwards based upon the twelve factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), *overruled on other grounds by* Blanchard v. Bergeron, 489 U.S. 87 (1989).  The Johnson factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Johnson, 488 F.2d at 717-19.

In the instant case, the Professional Services Itemization reflects that Woods charged an hourly billing rate of $300.00 and expended 44.05 hours in prosecuting the Adversary from September 26, 2011, through July 7, 2012.  As a result, the "lodestar" fee is $13,215.00.

At Trial, Woods testified that he has been a licensed attorney in the State of Mississippi since 1991.  During that time period, his primary area of practice has been consumer bankruptcy.[51]  Woods further testified that he has handled litigation similar to the Adversary in the past. Yet, he believed this Adversary presented a novel issue of law, namely, whether oral notice by the debtor that she had

---

[51] Test. of Woods at 2:12:59-2:14:25.

filed a bankruptcy petition is sufficient notice to constitute knowledge of the automatic stay.[52] According to Woods, the Adversary did not preclude him from handling other matters, but "it certainly affected [his] ability to handle other litigation."[53]

After reviewing the billing entries, and in light of the fact that Magee Rentals did not object to the amount of any of the fees claimed at Trial, the Court concludes that 44.05 hours was a reasonable amount of time for Woods to expend on this Adversary. The Court concludes that Woods' billing rate of $300.00 per hour was likewise reasonable.

This Court has within its discretion to modify the "lodestar" fee based upon the twelve Johnson factors. *See* CRG Partners Group, LLC v. Neary (In re Pilgrim's Pride Corp.), No. 11-10774, 2012 U.S. LEXIS 16702 (5th Cir. Aug. 10, 2012) (holding that U.S. Supreme Court's decision in Perdue v. Kenny A. el rel Winn, 130 S. Ct. 1662 (2010), did not overrule framework applying Johnson factors). The Debtor's arguments at Trial in support of her attorney's fees related to the following three Johnson factors: (1) the novelty and complexity of the issues; (2) the results obtained, and (3) the skill required. Many of the other Johnson factors are irrelevant given the nature of the Adversary.

As to the first Johnson factor, the Court agrees that there was a somewhat novel, legal question that confronted Woods, namely, whether oral notice of the filing of a bankruptcy petition charges a creditor with "knowledge" under § 362(k). The Court finds, however, that it is an issue that has been addressed by other courts, including other bankruptcy courts in the Fifth Circuit, and it is not an issue that this Court believes is particularly complex. As to the "results obtained" and

---

[52] Id. at 2:17:20-12:17:55.

[53] Id. at 2:18:25-2:18:36.

"skill required" factors, the Court finds that they are already fully reflected in the lodestar fee.  In sum, the Court finds that the Debtor has not demonstrated that an adjustment to the lodestar fee is necessary and finds that the attorney's fees sought by the Debtor in the amount of $13,215.00, are reasonable and fair.

### 2.      Mitigation of Debtor's Actual Damages

Having determined that the Debtor incurred actual damages in the total amount of $13,932.23, the Court next considers whether the Debtor made reasonable efforts to mitigate those damages.  This analysis is necessary to determine whether the Debtor's damages were reasonably incurred as a result of the stay violation by Magee Rentals.  Eskanos & Adler, P.C. v. Roman (In re Roman), 283 B.R. 1, 11 (9th Cir. B.A.P. 2002).

The Court finds that a substantial amount of the Debtor's actual damages was needlessly incurred and is not compensable for that reason.  The Debtor had at least three opportunities to take corrective action that would have ended Magee Rentals' collection efforts, but her attorney failed to do so.  For example, shortly after the Debtor filed the Petition, her attorney was made aware that the Notice of the Bankruptcy Case was returned because of an insufficient mailing address, but he did not attempt to correct the address in the creditor mailing matrix.  If he had done so, Magee Rentals would have received verification that the Debtor had filed a bankruptcy case and likely would have removed the Debtor's name from its computer system.

Moreover, Love testified that sometime prior to the date the third door hanger appeared, he spoke with the Debtor about the ongoing collection efforts by Magee Rentals.  Love recalled meeting with the Debtor in person at the Bond Botes & Woods law office in Byram, Mississippi.  Love testified that he did not contact Magee Rentals immediately after this meeting with the Debtor as "it

was an ongoing process we were working on . . . to determine the extent of the stay violation and gathering the documents so that I'd be prepared when I did call Magee Rentals."

It is these last two missed opportunities that are the most perplexing. Why did Love wait to contact Magee Rentals? If Love had acted more promptly, it is likely that Magee Rentals never would have hung the third door hanger, or perhaps the second door hanger, depending on when the meeting between Love and the Debtor actually occurred. As may be recalled, Magee Rentals ended its conduct after Love sent Breaux a copy of the Notice of Bankruptcy Case and a proof of claim form.

Because of these lost opportunities, the Court finds that the Debtor could have mitigated her actual damages, including her lost wages, travel expenses, emotional distress, and attorney's fees. In light of this finding, the Court limits the Debtor's actual damages to $3,300.00.

### 3.    Punitive Damages

Punitive damages may be awarded for a willful violation of the automatic stay under § 362(k) in "appropriate circumstances." The Fifth Circuit has held that an "egregious conduct" standard applies in considering an award of punitive damages. Repine, 536 F.3d at 521, *citing* Knaus v. Concordia Lumber Co., Inc. (In re Knaus), 889 F.2d 773, 776 (8th Cir. 1989). Because the Adversary presents a somewhat novel question of law, not yet definitively answered by the Fifth Circuit, this Court finds that Magee Rentals' conduct does not rise to the level of "egregious conduct" that would warrant an award of punitive damages.

### IV.  Conclusion

Based on the foregoing, the Court concludes that the Debtor has successfully demonstrated that Magee Rentals willfully violated the automatic stay. The Court further finds that the Debtor has

incurred actual damages in the amount of $13,932.23, but is entitled to an award of only $3,300.00 in actual damages against Magee Rentals, because of her failure to mitigate her losses.  A final judgment consistent with this opinion will be entered in accordance with FED. R. BANKR. P. 7054 and 7058.

       SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  August 28, 2012